**In re LUDWIG REALTY CORPORATION,**
**Debtor.**

**In re Charles Ludwig Debtor.**

**Bankruptcy Nos. 95–11862B, 95–11968B.**

United States Bankruptcy Court,
W.D. New York.

May 14, 1999.

William J. Brown, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for Champion Ventures and One Fine Corporation.

Mark Wallach, Penny, Maier, Wallach & Crowe, Buffalo, N.Y., for Ludwig Realty Corporation.

Harold Bulan, Goldstein, Bulan & Chiari, Buffalo, N.Y., for Charles Ludwig.

CARL L. BUCKI, Bankruptcy Judge.

This case requires the application of Oklahoma law to a complicated, multi-party real estate transaction. The central issue is whether a negative covenant creates an equitable lien that is enforceable against real property. Under Oklahoma law, attorney's fees are due to the prevailing party in any action to enforce a lien or mortgage, including an equitable lien. The purported holders of an equitable lien now seek recovery of these legal costs.

### PART I: THE FACTS

In 1988, the Ludwig Equity Corporation ("LEC") [1] contracted to purchase the Marina Apartment complex, located in Tulsa, Oklahoma, from Champion Financial Corporation. Despite several extensions of time, LEC was unable to obtain the financing needed to close the transaction.

---

1. Ludwig Equity Corporation is owned by Charles Ludwig. LEC is not now in bankruptcy. It had filed a Chapter 11 petition in Oklahoma, but that petition was dismissed as a bad faith filing.

As an alternative, LEC agreed in 1989 to lease the Marina complex from Champion Ventures, with an option to purchase the property within three years. Champion Ventures ("Champion") is the successor in interest to Champion Financial Corporation. As consideration for the option only, LEC paid $300,000, which it borrowed from One Fine Corporation ("OFC").[2] Charles Ludwig, one of the debtors herein, executed guaranties for payment of the promissory note to OFC and of the lease obligation to Champion. To secure these guaranties, Ludwig further pledged his stock in Ludwig Realty Corporation, the other debtor herein. Ludwig Realty Corporation was the owner of the Woodcreek Apartments, which were also located in Tulsa. At the time, two mortgages already encumbered the Woodcreek Apartments, and the parties chose not to use a third mortgage to collateralize the guaranties to Champion and OFC. However, to provide some assurance that the pledge of stock would retain value, Ludwig Realty Corporation executed a document entitled "Woodcreek Covenant." Recorded in the office of the county clerk in Tulsa, this instrument contained a negative covenant by which Ludwig Realty Corporation agreed that it would "not make or execute . . . any deed, mortgage, deed of trust, conveyance, security agreement, or any other instrument . . . having the effect of a lien, encumbrance, restriction, or conveyance of or on the Property . . . or creating or granting a security interest therein without the prior written approval of Champion." Additionally, the instrument provided that any lien or encumbrance "made, executed, or placed on the Property, in violation of the aforesaid covenants and warranties shall be null and void and of no force or effect at law or in equity."

Upon expiration of the three year option to purchase the Marina Apartments, Champion initiated proceedings to recover possession of the leased complex. For purposes of this decision, the court need not describe the protracted litigation which ensued. Ultimately, however, Champion and OFC obtained judgments against LEC and attempted to execute upon them. Meanwhile, Ludwig Realty Corporation had defaulted on the first and second mortgages covering the Woodcreek Apartments. Crown Capital Corporation, the holder of the second mortgage, began foreclosure proceedings in November 1994, and Huntoon Hastings Capital Corporation, the first mortgagee, intervened in April 1995. Because Champion and OFC had recorded the Woodcreek Covenant, they were named as defendants in the foreclosure action. On June 1, 1995, these parties answered the foreclosure complaint and cross claimed to assert an equitable lien. Then on June 2, 1995, and June 12, 1995, Ludwig Realty Corporation and Charles Ludwig respectively filed the present petitions for relief under Chapter 11 of the Bankruptcy Code.

Huntoon Hastings, Crown Capital, Champion, and OFC moved under 11 U.S.C. § 362(d) for relief from the automatic stay, so that the foreclosure proceedings might continue in Oklahoma. Ultimately, they settled that motion through a sale of the Woodcreek Apartments. The proceeds of sale have been applied first to satisfy the mortgages of Huntoon Hastings and Crown Capital. Claiming to possess an equitable mortgage that extends further to secure all legal costs that they have incurred in connection with enforcement of their lien rights, Champion and OFC now seek stay relief to recover their attorney's fees from the balance of the sale proceeds and from other assets of the debtors.

## PART II: LEGAL ANALYSIS OF THE NEGATIVE COVENANT

 Because the alleged lien would encumber real property in Oklahoma, the

---

**2.** One Fine Corporation and Champion are related entities. Stuart Jaffe, president of OFC, is the general partner of Champion.

validity of that lien is a matter of Oklahoma law. Oklahoma, like New York, recognizes an equitable lien in the case of an overreaching lender who demands from the borrower an absolute deed to real estate, instead of a mortgage. In such an instance, the lender possesses only an equitable mortgage, which must be foreclosed, so as not to deprive the borrower of the right of redemption. *Orton v. Citizen's State Bank,* 99 Okla. 80, 225 P. 899 (1924); *Republic Financial Corp. v. Mize,* 682 P.2d 207 (Okla.1983); *In re McCarty,* No. 97–01437, (Bankr.N.D.Okla.1998). Unlike New York, however, Oklahoma also recognizes an equitable lien in several other situations. For example, a written promise to give a lien on real property, as security for the promisee's commitment to act as surety, creates an equitable mortgage which is enforceable as a charge against the land. *Jones v. Hill,* 167 Okla. 552, 31 P.2d 145 (1934). Similarly, a written promise to grant a lien on real property to secure payment for services is sufficient to create an equitable lien. *Deming Investment Company v. Christensen,* 60 Okla. 148, 159 P. 663 (1916). In appropriate circumstances, a loan commitment may evidence the creation of an equitable lien. *Waukomis State Bank v. Fuksa (In re Fuksa),* 23 B.R. 258 (Bankr.W.D.Okla. 1982). Even an oral promise to pay attorney's fees first out of certain accounts receivable created an equitable lien in favor of the attorney for the value of the work performed. *Clark v. Armstrong & Murphy,* 180 Okla. 514, 72 P.2d 362 (1937). However, in none of the cited cases was a negative covenant, by itself, sufficient to establish an equitable lien.

The general rule of law in Oklahoma is that "any written contract entered into for the intended purpose of pledging property or some interest therein as security for a debt, will constitute an equitable mortgage thereon and be enforceable in a court of equity." *In re Fuksa,* 23 B.R. 258, 261 (Bankr.W.D.Okla.1982), *quoting Jones v. Hill,* 167 Okl. 552, 31 P.2d 145

(1934). As a theoretical proposition, a covenant can constitute an equitable mortgage if it is contained in a written contract, and if it demonstrates an intent to pledge the property as security for a debt. The Woodcreek Covenant satisfies the first of these requirements, in that it is part of a multi-document written contract. As to the second requirement, however, the court finds that this type of negative covenant fails to demonstrate the necessary intent to encumber a property interest.

By its language, the Woodcreek Covenant sought not to create a lien for the benefit of Champion and OFC, but only to preclude the creation of a lien for the benefit of some other party. Having received a pledge of Charles Ludwig's stock interest in Lugwig Realty Corporation, Champion and OFC obviously sought to limit the dissipation of the corporation's equity. But any such equity would exist, if at all, only after satisfaction of unsecured creditors. No basis exists to infer an intent to acquire a lien whose effect would be to grant priority over those unsecured creditors. Rather, any such inference would contradict the essence of a stock pledge, that is, a security interest that extends only to the equity of Ludwig Realty Corporation. Thus, the Woodcreek Covenant is to be distinguished from agreements that purport to reserve assets for the benefit of a specific creditor and to the exclusion of all unsecured claims.

In *Young v. J.A. Young Machine & Supply Co.,* 203 Okla. 595, 224 P.2d 971 (1950), the Oklahoma Supreme Court rejected the notion that a negative covenant could create an equitable lien. This case involved a father who borrowed money from his son and executed a promissory note to evidence the indebtedness. At the same time, the father and son executed another document called a "Guaranty." It recited that the son waived his right to demand a mortgage as security, but that the father would not, at any time prior to the full repayment of the note, make, execute, or deliver any note or mortgage cov-

ering a particular parcel of real estate. If the property were to be encumbered, the father's note would become immediately due and payable. Later, after the father granted a mortgage on the same real estate to a bank, the son sued to impress a lien upon the property. Affirming a judgment for the father, the Supreme Court of Oklahoma held that the "Guaranty" did not create an equitable mortgage.

> Unless there can be found in the instrument ... language which creates a lien by agreement, then there is no lien, equitable or otherwise. An intention to create a lien on property must clearly appear from the language of the instrument and the attendant circumstances, and strict proof of such intention is required.

> Where an instrument.... only provided that the unpaid balance of a certain unsecured promissory note may be declared matured.... and due.... at the option of the payee, if the maker executed any mortgage lien, or permitted a lien, judgment or assessment to become a legal charge for more than thirty days upon certain real estate of [the] maker, such instrument does not create a lien.

*Young,* 203 Okla. at 597–98, 224 P.2d 971.

Champion and OFC have correctly noted two differences between the Woodcreek Covenant and the agreement in *Young.* First, the *Young* covenant contained an express waiver of the payee's right to demand a mortgage as security. Second, the Woodcreek Covenant declares all other prospective liens to be null and void. These differences, however, are without a distinction. The critical feature of both the Woodcreek Covenant and the *Young* "Guaranty" is the absence of any attempt to acquire a priority over unsecured creditors. While the agreement in *Young* may have expressly waived any right to demand a mortgage, nothing in the Woodcreek Covenant suggests the creation of a mortgage. Even if one could enforce a declaration regarding the nullity of future liens, such a declaration does nothing to establish the secured status of Champion and OFC with respect to any asset of Ludwig Realty Corporation (as distinct from a security interest in the equity of corporate stock). Rather, the Woodcreek Covenant merely reinforces the position of Champion and OFC as creditors seeking to assure the availability of equity to which they might look for recovery.

In urging the recognition of an equitable mortgage, Champion and OFC would rely upon admissions supposedly contained in an "Interoffice Memorandum" dated July 28, 1994, from Arthur Bailey to Alan Durbin. At that time, Bailey was a business associate of Charles Ludwig, while Durbin served as counsel to Champion and OFC. Specifically, this Memorandum acknowledged that in order to close a refinancing, "Champion had to release its ... Wood Creek [sic] mortgage covenant." At best, this language is itself ambiguous, for it can be read to describe the covenant either as one creating a mortgage or as one prohibiting the grant of a mortgage to some third party. Bailey prepared the Memorandum more than five years after Ludwig Realty Corporation had executed the Woodcreek Covenant. Not signed by either debtor, the Memorandum can serve only as an admission by Bailey, who is not a party to the present proceeding. Because it was prepared so long after the Woodcreek Covenant, the Memorandum would have minimal relevance to the debtors' intent at the time of the execution of the Covenant. In any event, the court would consider such extrinsic evidence only if the Woodcreek Covenant were itself ambiguous. To the contrary, the Covenant is clear in its failure to create an equitable lien.

### PART III: ENTITLEMENT TO LEGAL FEES

The statutes of Oklahoma provide that "[i]n an action brought to enforce any lien, the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the

action." 42 O.S. § 176. Because the Woodcreek Covenant does not create an equitable lien, Champion and OFC have no entitlement for payment of legal fees from the proceeds of the Woodcreek property. Accordingly, the motion for stay relief to recover such a claim is denied. To the extent that these creditors enjoy some basis to encumber other assets or to assert an unsecured claim for legal fees, they should file an appropriate proof of claim. The court will then give consideration to any such claim if and when it becomes the subject of a proper objection.

So ordered.